IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

FILED
DEC 03 2025
JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____ Ada _____, DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. CR 25-489 JD |
| -vs- ) | |
| ) | |
| DANNY W. SEIBEL, ) | Violations: 18 U.S.C. § 1349 |
| ) | 18 U.S.C. § 1344(1) |
| Defendant. ) | 18 U.S.C. § 2 |
| ) | 18 U.S.C. § 1005 |
| ) | 18 U.S.C. § 1517 |
| ) | 31 U.S.C. § 5318(h) |
| ) | 31 U.S.C. § 5322(b), (e) |
| ) | 18 U.S.C. § 981(a)(1)(C) |
| ) | 18 U.S.C. § 982(a)(2) |
| ) | 28 U.S.C. § 2461(c) |

## INDICTMENT

The Federal Grand Jury charges:

### The First National Bank of Lindsay

1. At all times relevant to this Indictment, The First National Bank of Lindsay ("FNBL" or "the Bank") was a financial institution with a single branch in Lindsay, Oklahoma, that maintained deposits insured by the Federal Deposit Insurance Corporation ("FDIC").

2. FNBL was regulated by the Office of the Comptroller of the Currency ("OCC"). The OCC conducted regular examinations of FNBL to

evaluate FNBL's activities and management processes, as well as to ensure that the Bank operated in a safe and sound manner and complied with laws and regulations.

3.   On or about October 18, 2024, FNBL failed, and the OCC appointed the FDIC as its receiver. As receiver, the FDIC assumed the responsibility of collecting and selling the assets of FNBL and settling its debts.

4.   **DANNY W. SEIBEL** ("**SEIBEL**") began working at FNBL in or about 1993. From in or about February 2007 until he was placed on leave on or about September 12, 2024, and then terminated on or about September 20, 2024, **SEIBEL** served as the Bank's President and Chief Executive Officer, and, at various points, as the Bank's Chief Financial Officer, Information Technology Officer, Bank Secrecy Act ("BSA") Officer, and Compliance Officer. **SEIBEL** was also an FNBL loan officer, and served on the Bank's Board of Directors ("the Board") and Executive Loan Committee ("ELC").

5.   FNBL's Board met monthly to review packets that **SEIBEL** prepared detailing the Bank's loans, overdrawn accounts, and past-due accounts. The ELC, a committee of the Board, met roughly once every one to two weeks to review proposed loans and Bank financial information, among other things. **SEIBEL** also prepared packets for these weekly or bi-weekly Loan Committee meetings.

6. Borrower 1 was an FNBL customer who owned a trucking company and other businesses based in Lindsay, Oklahoma. Borrower 1's trucking company maintained an FNBL business checking account—account # xx2071 ("the Borrower 1 xx2071 Account")—that was frequently overdrawn. Borrower 1 controlled the Borrower 1 xx2071 Account.

7. Borrower 2 was a friend of **SEIBEL**'s who owned several automotive businesses in and around the Lindsay area, as well as a company that purportedly sold signs and T-shirts. Borrower 2 controlled FNBL accounts tied to his various business endeavors, including a checking account in the name of one of his car businesses—account # xx8570 ("the Borrower 2 xx8570 Account")—and was a frequent gambler.

8. Borrower 3 was an FNBL customer who owned and operated an HVAC business that often serviced marijuana grow houses. Borrower 3 and **SEIBEL** were also friends.

9. At all times relevant to this Indictment, **SEIBEL** handled all relevant FNBL loans issued to Borrowers 1, 2, and 3.

## COUNT ONE
### (Conspiracy to Commit Bank Fraud)

10. The Federal Grand Jury incorporates Paragraphs 1–9 by reference.

11. From on or about February 25, 2020, through on or about September 20, 2024, in the Western District of Oklahoma,

------------------------------ **DANNY W. SEIBEL** ------------------------------

knowingly, intentionally, and with interdependence, combined, conspired, and agreed with others known and unknown to the Federal Grand Jury, including Borrowers 1 and 2, to commit the offense of bank fraud, a violation of Title 18, United States Code, Section 1344.

## The Object of the Conspiracy

12.  The object of the conspiracy was to enrich certain FNBL borrowers—including Borrowers 1, 2, and 3—and allow **SEIBEL** to maintain his position and stature in the community, as well as his income, as the Bank's President and CEO by concealing the Bank's true financial condition.

## Manner and Means

13.  The object of the conspiracy was accomplished as follows:

A.  **SEIBEL** issued loans to certain FNBL borrowers—many of whom were his personal friends and neighbors—that the borrowers either never repaid or for which **SEIBEL** never recorded any payments. Some borrowers were unaware that **SEIBEL** was failing to record their loans, posting fake loans to their accounts, or making false entries in FNBL records about their loans and accounts.

B.  **SEIBEL** frequently manipulated the Bank's records to make loans he approved or oversaw appear successful by changing Bank records to make it seem that loans had not matured, were not overdue, or that borrowers had

never missed a payment. In some instances, **SEIBEL** disbursed proceeds from loans to borrowers without recording the loans in the Bank's software system.

    C.    Some of the borrowers to whom **SEIBEL** issued FNBL proceeds, including Borrowers 1 and 2, were aware of **SEIBEL**'s manipulative tactics and the financial benefits that they derived from these tactics. On several occasions, Borrowers 1 and 2 texted **SEIBEL** asking him to "fix" or add funds to their overdrawn accounts by manually adding FNBL funds to their accounts when they needed money.

    D.    **SEIBEL** falsely stated the purpose of some of the loans that he issued. On several occasions, **SEIBEL** disbursed loans to Borrowers 1 and 2 purportedly to purchase or improve real estate, vehicles, or equipment. The proceeds were instead used to repay portions of other loans, gamble, or pay day-to-day expenses.

    E.    At meetings held by FNBL's Board and ELC, **SEIBEL** failed to disclose the true extent of borrowers' overdrafts or past-due loans, grossly misstating the amount of loans that FNBL had issued and failed to collect—due to borrower non-payment—by millions of dollars. **SEIBEL** frequently omitted borrowers with large nonperforming balances entirely from the past-due and overdraft reports he provided to the Board and ELC.

## Acts in Furtherance of the Conspiracy

14. To effect the object of the conspiracy, **SEIBEL**, Borrower 1, and Borrower 2 committed the following acts, among others:

A. On or about March 2, 2020, **SEIBEL** approved a $68,773.41 loan—loan # 29801—to a company co-owned by **SEIBEL** and Borrower 3 for the purpose of "purchas[ing] real estate for resale." Borrower 3 and **SEIBEL** never made any payments on the loan. Instead, **SEIBEL** accessed FNBL's computer system on multiple days throughout 2020, 2021, 2022, 2023, and 2024, and manually extended the maturity date on the loan. **SEIBEL** also made changes to the loan's payment date (*i.e.*, the date the next payment was supposed to come due) and the number of times it had been past due, thereby concealing the loan's nonperformance from the Board and making the loan appear healthy.

B. On or about February 17, 2023, the Borrower 2 xx8570 Account was overdrawn by $713,892.97. That same day, **SEIBEL** manually added $400,000.00 into the Account, when no such deposit had actually been made.

C. On or about February 23, 2023, the Borrower 2 xx8570 Account was overdrawn by $362,890.51. **SEIBEL** manually added $526,000.00 into the Account that same day, when no such deposit had actually been made.

D. On or about March 29, 2023, the Borrower 2 xx8570 Account was overdrawn by $372,013.40. The following day, **SEIBEL** created a new loan

in the amount of $400,000.00—loan number 31137—to cover the overdraft. Approximately three months later, on or about July 5, 2023, **SEIBEL** reassigned loan 31137 to a business associated with Borrower 3, without notifying Borrower 3 or others associated with that business. **SEIBEL** then made multiple changes to the loan's maturity date, pay date, and other information throughout 2023 and 2024. These changes made loan 31137 appear healthy, despite only one payment of approximately $6,400.00 ever being recorded for this putative $400,000.00 loan.

      E.    On or about July 5, 2023, **SEIBEL** texted Borrower 2 and asked Borrower 2: "Any pull to get us a nice room at Riverwind [Casino] Saturday night? Or somewhere else close by? Tried Artesian [Casino] but booked up[.]" Borrower 2 responded the following day: "You're completely set up for Saturday night under your name[.]"

      F.    On or about August 31, 2023, **SEIBEL** again texted Borrower 2 and asked Borrower 2 whether he could book him a room at the Riverwind Casino. Borrower 2 replied that he had reserved **SEIBEL** a "[j]unior suite." **SEIBEL** responded: "No shit?! Awesome. Thanks man."

      G.    On or about September 20, 2023, the Borrower 1 xx2071 Account had a negative balance of $45,507.42. On or about September 29, 2023, **SEIBEL** created a new loan to cover the overdraft—loan number 31319—in the amount of $70,000.00, and deposited the proceeds into the Borrower 1

7

xx2071 Account.

H.   On or about October 6, 2023, Borrower 1 texted **SEIBEL** and asked **SEIBEL** to add more money to his trucking company's checking account to cover operating expenses. **SEIBEL** replied, "Dude[,] I just covered $70k and now you're $31k over. I'll give you $5k now and that is all[,] you gotta start putting money in."

I.   On or about March 7, 2024, Borrower 1 texted **SEIBEL** and again asked him to "fix" his account. **SEIBEL** responded, "You bring me deposits tomorrow. I am finally totally tapped. Way too far OD. You need to go factor and cover this overdraft . . . . Hey I'm over $500k. I'm tired of taking care of your business and get no damn deposits. I have legal lending limits and overdrafts are part of it. I'm sorry my job ain't worth it."

J.   On or about March 28, 2024, the Borrower 1 xx2071 Account had a negative balance of $533,598.54. The following day, **SEIBEL** manually added $536,850.00 to the Account, clearing the overdraft, when no such deposit had actually been made.

K.   On or about June 14, 2024, Borrower 2 texted **SEIBEL** and asked him to "wire 15k out of [account number] 240176 to Nevada." **SEIBEL** replied: "Done."

L.   On or about June 27, 2024, **SEIBEL** texted Borrower 2 and told him that he was at the Bank to "cover" overdrafts, adding, "[t]omorrow is end

8

of quarter and reporting day."

M.   On or about August 16, 2024, Borrower 2 texted **SEIBEL** that he "need[ed] [$]37[,]275 wired to Nevada" and that **SEIBEL** would "get it back Wednesday" in order to "cover[] insurance and taxes." **SEIBEL** wired funds to Borrower 2 as instructed. Borrower 2 did not use the funds for "insurance and taxes;" instead, Borrower 2 used or withdrew some of the funds at Riverwind Casino.

N.   In September 2022, February 2023, May 2023, June 2023, and May 2024, **SEIBEL** submitted packages or made statements to FNBL's Board or ELC that falsely represented the Bank's financial condition. For example, **SEIBEL** reported to the ELC in May 2024 that the Bank had a total of $169,973.57 in overdrafts. In reality, FNBL records showed that the Bank's overdrafts totaled $1,363,141.50.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO-SIX
### (Bank Fraud)

15.   The Federal Grand Jury incorporates Paragraphs 1–9 and 11–14 by reference.

### The Scheme to Defraud

16.   It was part of the scheme to defraud that **SEIBEL** committed the acts alleged in Paragraphs 13 and 14, which the Federal Grand Jury

incorporates by reference.

## Executions of the Scheme to Defraud

17. On or about the following dates, in the Western District of Oklahoma,

———————————— DANNY W. SEIBEL, ————————————

with intent to defraud, knowingly executed a scheme and artifice to defraud FNBL, a financial institution that was insured by the FDIC, by means of materially false pretenses, representations, and promises, as follows:

| Count | Approx. Date | Beneficiary | Loan | Description of Execution |
|---|---|---|---|---|
| 2 | 2/11/2022 | Borrower 2 | 30331 | Changes to loan term and information about the loan related to payment. |
| 3 | 12/29/2023 | Borrower 1 | 30442 | Changes to information related to payment and other relevant information. |
| 4 | 3/29/2024 | A company controlled by **SEIBEL** and Borrower 3 | 29801 | Changes to loan term, information related to payment, and other relevant information. |
| 5 | 1/1/2024 | Borrower 2 | 30379 | Changes to loan term, information related to payment, and other relevant information. |
| 6 | 6/27/2024 | Borrower 2 | 30257 | Changes to information about payment and other relevant information. |

All in violation of Title 18, United States Code, Section 1344(1), and Title 18, United States Code, Section 2.

## COUNTS SEVEN-SIXTEEN
### (False Bank Entries)

18.   The Federal Grand Jury incorporates Paragraphs 1–9, 13, 14, and 17 by reference.

19.   FNBL used a banking software program called Shazam to record and manage customer transactions. Information from Shazam was reflected in FNBL's records, including the financial reports that **SEIBEL** sent to regulators and members of the Board. Shazam recorded changes made to account files in a record called the "Daily Maintenance Report," which it generated for every day that a user made such changes.

20.   The changes **SEIBEL** made were reflected on the Bank's loan trial balance—an overview of outstanding loans made by the Bank as of a specific date. These changes, which included false extensions of maturity dates and other information critical to assessing the health of the Bank's loan portfolio, generally appeared on the Bank's loan trial balance within one or two business days after **SEIBEL** made them.

21.   On a quarterly basis, FNBL submitted Reports of Condition and Income ("Call Reports") to the Federal Financial Institutions Examination Council ("FFIEC"), a formal interagency body composed of federal regulators that published quarterly data on financial institutions. **SEIBEL** oversaw the preparation of FNBL's Call Reports and played a significant role in preparing

and submitting them.

22. FNBL's Call Reports included information about FNBL's income, assets, liabilities, securities, and loans. In particular, FNBL's Call Reports provided the total amount of loans that were (a) "Past due 30 through 89 days and still accruing," (b) "Past due 90 days or more and still accruing," and (c) "Nonaccruing." The information reported on FNBL's Call Reports was typically pulled from FNBL's loan trial balance, which was generated in Shazam. FNBL's Call Reports, including the loan amounts described above, were published, reviewed, and relied upon by regulators—including the OCC—to assess FNBL's activity, management processes, and compliance, as well as FNBL's liquidity.

23. On or about the following dates, in the Western District of Oklahoma,

---------------------------------- **DANNY W. SEIBEL**, ----------------------------------

while an officer of FNBL, with the intent to deceive FNBL's Board, FNBL's ELC, the OCC, or the FDIC, knowingly made a false entry in the books, reports, and statements of FNBL, as follows:

| Count | Approx. Date | Document | False Entry |
|---|---|---|---|
| 7 | 9/27/2022 | Loan Trial Balance | False and fraudulent information concerning loans to a company controlled by Borrower 3 and **SEIBEL**, and others, including information regarding maturity dates, payment dates, and times past due. |
| 8 | 9/29/2022 | ELC Packet | False representation of overdrawn and past-due accounts. |
| 9 | 10/31/2022 | Loan #29646 | Forged signature of FNBL borrower. |
| 10 | 3/16/2023 | ELC Packet | False representation of overdrawn and past-due accounts. |
| 11 | 6/15/2023 | ELC Packet | False representation of overdrawn and past-due accounts. |
| 12 | 1/30/2024 | Call Report | False representation of past-due loans. |
| 13 | 3/29/2024 | Loan Trial Balance | False and fraudulent information concerning loans to a company controlled by Borrower 3 and **SEIBEL**, and others, including information regarding maturity dates, payment dates, and times past due. |
| 14 | 4/30/2024 | Call Report | Underrepresentation of past-due loans. |
| 15 | 5/17/2024 | ELC Packet | Underrepresentation of overdrawn and past-due loans. |
| 16 | 7/30/2024 | Call Report | False representation of past-due loans. |

All in violation of Title 18, United States Code, Section 1005.

## COUNT SEVENTEEN
### (Obstructing the Examination of a Financial Institution)

24.   The Federal Grand Jury incorporates Paragraphs 1–9, 13, 14, 17, 19, 20, and 21 by reference.

25.   In or around August 2024, OCC examiners began a regularly scheduled on-site examination of FNBL.  In the course of their investigation, examiners requested and reviewed a copy of FNBL's loan trial balance that included borrower identifiers, unpaid loan balances, and other information. According to the purported loan trial balance that **SEIBEL** provided, FNBL borrowers had made payments on 100 different loans on or around June 27, 2024.   Due to this suspiciously high volume of activity, OCC examiners asked **SEIBEL** to provide the Bank's Daily Maintenance Report for June 27, 2024.

26.   On or about September 11, 2024, in the Western District of Oklahoma,

———————————————— **DANNY W. SEIBEL,** ————————————————

corruptly obstructed or attempted to obstruct an examination of a financial institution by the OCC, an agency of the United States with jurisdiction to conduct an examination of such financial institution.  In particular, **SEIBEL** provided the OCC with a false and fraudulent Daily Maintenance Report for June 27, 2024, that omitted hundreds of changes that **SEIBEL** had manually

made to the due date, maturity date, and times past due of numerous FNBL loans.

All in violation of Title 18, United States Code, Section 1517.

27. After **SEIBEL** learned that the OCC had obtained an unaltered copy of the Daily Maintenance Report for June 27, 2024, he texted another Bank employee, "I think I'm nailed to the wall now I [g]ave them a report that [is not] the same as what they got now and they have both.  Nobody's fault but my own.  Also, delete these texts."

## COUNT EIGHTEEN
**(Failure to Maintain an Anti-Money Laundering Program)**

28. The Federal Grand Jury incorporates Paragraphs 1–9, 13, 14, 17, 19, 20, and 21 by reference.

29. FNBL was a financial institution within the meaning of the Bank Secrecy Act, Title 31, United States Code, Section 5312(a)(2) ("the BSA"), and was required to implement an Anti-Money Laundering ("AML") program that included a system of internal controls to identify, monitor, and report suspicious transactions, as required under Title 31, United States Code, Section 5318(h) and 31 C.F.R. § 1020.210(a).

30. As part of the implementation of an AML program, the BSA also required FNBL to designate one or more individuals to coordinate and monitor day-to-day compliance with this AML program.  Starting in at least 2019 and

continuing through early 2024, **SEIBEL** served as the Bank's BSA Officer, and was tasked with this role. This designation, combined with **SEIBEL**'s other responsibilities at the Bank, gave him control of FNBL's AML program.

### Seibel's Role as BSA Officer

31. To conceal his own misconduct and benefit certain borrowers, **SEIBEL**, who was responsible for the Bank's AML program, caused FNBL to violate the Bank Secrecy Act.

32. As of 2024, **SEIBEL** had willfully failed to implement any processes to monitor suspicious activity through non-cash channels (such as wire transactions, monetary instrument logs, or checks), despite creating a written policy indicating that the Bank actually had such processes in place.

33. Between at least 2020 and in or around March of 2024, **SEIBEL** willfully failed to file reports on any suspicious transactions, including his own loan fraud. Between at least 2020 and 2024, **SEIBEL** also advised customers to make cash deposits below the Bank's required $10,000.00 reporting threshold and personally executed or assisted in executing transactions that should have been flagged as "suspicious" according to the Bank's own policy for detecting potential criminal activity.

34. Starting at least as early as 2019 and continuing through at least September 2024, in the Western District of Oklahoma,

---------------------------- **DANNY W. SEIBEL** ----------------------------

16

willfully failed to establish, develop, implement, and maintain an AML program at FNBL as required by law. **SEIBEL**, among other things, failed to establish, develop, implement, and maintain an AML program at FNBL reasonably designed to assure and monitor compliance with the requirements of the BSA; failed to develop internal policies, procedures, and controls at FNBL reasonably designed to assure and monitor compliance with the BSA; failed to designate an appropriate person to coordinate and monitor day-to-day compliance; failed to provide training for appropriate personnel; and failed to monitor, investigate, detect, and report suspicious transactions by, through, or to the FNBL, all as part of a pattern of any illegal activity involving more than $100,000.00 in a 12-month period, contrary to Title 31, United States Code, Sections 5318(h), 5322(b), 5322(e), and regulations issued thereunder, including Title 31, Code of Federal Regulations, Section 1020.210.

All in violation of Title 31, United States Code, Section 5318(h) and Title 31, United States Code, Sections 5322(b), and 5322(e).

## FORFEITURE ALLEGATIONS

Upon conviction of the offense alleged in Count One of this Indictment, **SEIBEL** shall forfeit to the United States any property, real or personal, constituting or derived from proceeds traceable to that offense, including but not limited to a money judgment representing the amount of proceeds obtained as a result of the offenses.

Upon conviction of any of the offenses alleged in Counts Two through Sixteen of this Indictment, **SEIBEL** shall forfeit to the United States any property, constituting or derived from proceeds obtained, directly or indirectly, as result of such offense(s), including but not limited to a money judgment representing the amount of proceeds obtained as a result of the offense(s).

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), **SEIBEL** shall forfeit substitute property, up to the amount described above, if, by any act or omission of the **SEIBEL**, the property described above, or any portion of that property, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 18, United States Code, Section 982(a)(2), and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

ROBERT B. TROESTER
United States Attorney

JULIA E. BARRY
JACKSON D. ELDRIDGE
Assistant U.S. Attorneys

MARGARET A. MOESER
Chief, Money Laundering, Narcotics and Forfeiture Section
Criminal Division, U.S. Department of Justice

MARK GOLDBERG
ELYSA Q. WAN
J. RYAN MCLAREN
Trial Attorneys